*10*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 0 7 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| BEATRIZ AZNAR | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-02-134 |
| | § | |
| WAL-MART STORES, INC. | § | |
| and SPACELABS MEDICAL, INC. | § | |

## RULE 26(a) DISCLOSURES OF DEFENDANT SPACELABS MEDICAL, INC.

TO THE HONORABLE UNITED STATES JUDGE:

NOW COMES SPACELABS MEDICAL, INC., a Defendant in the above entitled and

numbered cause, and makes this its Rule 26(a) Disclosures, pursuant to F.R.C.P. 26, and

would respectfully show onto the Court the following:

### Identity of Individuals Likely to Have
### Discoverable Information Relevant to Disputed Facts

1.  Beatriz Aznar
    Bravo 501, C.D. Victoria
    Taumalipas, Mexico 87000
    Phone: 011-52-834-312-0323
    *Plaintiff*

2.  Marcus Serrano
    Support Manager
    Wal-Mart Stores, Inc.
    2721 Boca Chica Blvd.
    Brownsville, Texas 78521
    *Mr. Serrano allegedly spoke to Plaintiff immediately after the incident*

3.  Jorge E. Loyez, M.D.
    1008 Alton Gloor Blvd., Suite 270
    Brownsville, Texas 78526
    *Has examined Plaintiff*

II.

**Documents which May Support Claims or Defenses**

See attached composite Exhibit "A".

III.

**Computation of Damages**

Not applicable to this Defendant.

IV.

**Insurance Information**

See attached Exhibit "B" (amount of premium paid has been deleted).

V.

**Supplementation**

This Defendant reserves the right to supplement the above disclosures as discovery proceeds.

Respectfully submitted,

ATLAS & HALL, L.L.P.

By: _____

Mike Mills
SBN: 14163500
USDC #1211
ATLAS & HALL, L.L.P.
P.O. Drawer 3725
McAllen, Texas 78502
Phone: (956) 682-5501
Fax   : (956) 686-6109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document has been mailed, certified mail, return receipt requested, to all counsel of record on this 7th day of November, 2002.

Peter M. Zavaletta
THE ZAVALETTA LAW FIRM
603 E. St. Charles Street
Brownsville, Texas 78520

Jaime Drabek
DRABEK & ASSOCIATES, P.C.
1720 E. Harrison, Suite B
Harlingen, Texas 78550

_____
Mike Mills

### Jorge E. Loyez, M.D., P.A.
DIPLOMATE AMERICAN BOARD OF NEUROLOGY

Tel. 350-0048 Fax 350-0051
Medical Exchange 350-0048

1008 Alton Gloor Blvd. Suite 270
Brownsville, Texas 78526

August 5, 2002

Peter Zavaletta
Attorney at Law
603 E. St. Charles
Brownsville, TX 78520

Re: Beatriz Aznar
DOI: February 17, 2002

### MEDICAL FOLLOW-UP REPORT

Dear Mr. Zavaletta:

This is to inform you that Ms. Aznar returned to my office for re-evaluation on August 5, 2002. Pain in the left shoulder radiating to the left upper extremity continues. She has complained of moderate weakness of the left upper extremity. She has been able to work regularly lifting boxes of beer with moderate difficulty.

The neurologic examination reveals moderate proximal and distal weakness of the left upper extremity. The deep tendon reflexes are 1+ in the right upper extremity. They are depressed in the left upper extremity. The reflexes in the lower extremities are 2+.

It usually takes a period of six to eight months for a nerve to recover completely and that period has already elapsed. Therefore, it can be stated that the chronic radiculopathy at C5/C6 on the right and the chronic radiculopathies at C5, C6, C7, C8, T1 on the left and the left brachial plexopathy are going to be chronic and leave her with a permanent disability.

A prescription for Darvocet N100 was given. She needs to return within three months for re-evaluation.

Respectfully yours,

Jorge E. Loyez, M.D., P.A.
Board Certified Neurologist

JEL/er



JORGE L. LOYEZ, M.D., P.A.
DIPLOMATE AMERICAN BOARD OF NEUROLOGY

Tel. 350-0048  Fax 350-0051
Medical Exchange 350-0048

1008 Alton Gloor Blvd. Suite 270
Brownsville, Texas 78526

April 29, 2002


Peter Zavaletta
Attorney at Law
603 E. St. Charles
Brownsville, TX 78520


Re: Beatriz Aznar
DOI: February 17, 2002


**MEDICAL NARRATIVE REPORT**

Dear Mr. Zavaletta:

This is to inform you that I examined this 61 yr. old female on April 17, 2002. According to Ms. Aznar she was sitting, drinking coffee on one of the local Wal-Mart stores on February 17, 2002 about 5 p.m., when the metal stand of a blood pressure machine, weighing according to the patient "about 90 kg." fell on her left forearm and hand and the left shoulder and upper portion of the arm. She immediately developed pain in the distal portion of the left shoulder, the upper portion of the left arm, left forearm and hand. She was upset and dazed for a while and developed pain in those areas. A report was made and she was advised to call (810) 527-0566. Following the accident she went to a hospital in Victoria, Tamaulipas where she was treated and x-rayed by a local doctor. X-rays of the left wrist, distal forearm and hand, showed no clear evidence of fracture. She works at a beer warehouse and was unable to work for three days due to the above mentioned injuries and weakness of the entire left upper extremity. Subsequently, she was able to work but with moderately difficulty.

She denies past history of similar accident or injuries. There is history of a motor vehicle accident three years ago in which she sustained no significant injuries. She denied history of diabetes mellitus or hypertension.

The neurological examination on April 17, 2002 revealed an alert, oriented, cooperative patient in no acute distress. Her height was 5'0 and her weight was 128 lbs.

Examination of the head and ears was normal.

Examination of the cranial nerves showed normal visual fields on confrontation. Funduscopic examination, OD was normal.

Examination of the III, IV and VI nerves showed no evidence of nystagmus or limitation of gaze. The pupils were normal. The rest of the cranial nerves showed no abnormalities.

Page 2
Apr. 29, 2002

Examination of the motor system showed moderate proximal and distal weakness of the entire left upper extremity. There was tenderness of the median aspect of the left wrist. The deep tendon reflexes were 2+ on the right extremities and 1+ on the left extremities. Plantar responses were flexor on the right and extensor on the left.

Examination of the sensory system showed pain and touch sensations to be decreased on the C4, C5, C6, C7, C8 dermatomes of the left upper extremity.

Examination of the cerebellar system showed no evidence of truncal ataxia. Finger to nose and alternation tests were normal.

Following my examination, I ordered x-rays of the cervical spine, x-rays of the left shoulder and the left wrist which were reported as normal.

EMG and Nerve Conduction Velocity studies of the upper extremities were done on April 18, 2002. The EMG showed evidence of chronic dennervation in the territory of C5, C6 on the right and of C5, C6, C8, T1 on the left, indicative of radiculopathies and a post-traumatic left brachial plexopathy.

The neurologic examination again revealed moderate proximal and distal weakness of the left upper extremity. The deep tendon reflexes remained 2+ on the right extremities and 1+ on the left extremities. Plantar responses were flexor on the right and equivocal on the left.

**My final impression is that this patient presents with:**
1. History of injuries to the left shoulder and the entire left upper extemity.
2. Post-traumatic left brachial plexopathy involving mainly C5, C6, C8, T1 roots.
3. Post-traumatic radiculopathies at C5/C6 on the right.
4. Post-traumatic arthritis of the left wrist.

It usually takes a period of six to eight months for a nerve to recover. Therefore, I will be able to give you an accurate prognosis regarding this case at the end of July or at the beginning of August 2002. She was given an appointment to return within two months fore re-evaluation. She was advised to keep taking Tylenol every six hours whenever necessary.

Respectfully yours,

Jorge E. Loyez, M.D., P.A.
Board Certified Neurologist

JEL/er
Enclosure: EMG/NCV Report

Tel. 350-0048  Fax 350-0051
Medical Exchange 350-0048

100B Alton Gloor Blvd. Suite 270
Brownsville, Texas 78526

PATIENT: Beatriz Aznar
AGE: 61 yrs.   DOB: 07/14/40
WEIGHT: 126 lbs.   HEIGHT: 5'0"

DATE OF STUDY: April 18, 2002
REF/PHYSICIAN: Dr. Loyez

## HISTORY
This 61 yr. old female was at a local Wal-Mart store on February 17, 2002 when a stand with a blood pressure machine fell on her Lt. shoulder and Lt. upper extremity causing local pain which has persisted since.  Subsequently, she developed weakness of that extremity.

## NERVE CONDUCTION VELOCITY STUDIES

| MOTOR CONDUCTION | DISTAL LATENCY (msec) | VELOCITY (M/sec) | AMPLITUDE (mv) |
|---|---|---|---|
| (MARTIN GRUBER) | | | |
| Rt. Median Nerve | 3.75(nl↓4.5) | 52 | 1.52 |
| Lt. Median Nerve | 3.36(nl↓4.5) | 56 | 3.79 |
| Rt. Ulnar Nerve | 2.66(nl↓4.0) | 55.4 | 6.31 |
| Lt. Ulnar Nerve | 3.05(nl↓4.0) | 47.0 | 6.42 |
| Rt. Ulnar F-Wave | 25.16 | | |
| Lt. Median F-Wave | 26.17 | | |

## ELECTROMYOGRAPHY
The Rt. supraspinatus showed fibrillation potentials and decreased interference pattern. The Rt. flexor carpi ulnaris showed no abnormalities.  The Lt. supraspinatus, Lt. infraspinatus and Lt. flexor carpi ulnaris showed fibrillation potentials and decreased interference pattern.  A sterile, monopolar disposable needle electrode was used.

## ELECTRODIAGNOSTIC INTERPRETATION
The Motor Nerve Conduction Velocity studies showed no significant abnormalities.  A Martin Gruber anastomosis is present on the Rt. (nl variant).

The EMG shows evidence of chronic dennervation in the territory of C5/C6 on the Rt. and of C5, C6, C6, T1 on the Lt. indicative of radiculopathies and a Lt. brachial plexopathy.

## THANK YOU FOR THIS REFERRAL

Jorge E. Loyez, M.D., P.A.
Board Certified Neurologist

JEL/er

Thank You



# Claim # L2717033

- Your form has been sent to the claims division.
- Please PRINT THIS FORM for your records before returning to main screen.



## STORE TYPE

Store/Location Number : 1000
Base Division Number : 01 - WAL-MART ASSOCIATES.

## STORE/LOCATION INFORMATION

Address : 2721 BOCA CHICA BLVD., BROWNSVILLE,, TX, 78520-0000
Phone : (512) 544-0394
Manager : SALINAS MELISSA
Division Charged : 10 - Pharmacy
Section Code : 99 - N/A

## CLAIM TYPE

Type of Incident : FALLING OBJECT/MERCHANDISE Claim involving customer/member struck by falling object/merchandise.

## FALLING OBJECT INFORMATION

What fell : BLOOD PRESSURE MACHINE
How many : 1
Number of photos taken : 6
Approx. weight of object (lb) : 30
Approx. weight of object (Oz) : 0
Stacked how many high : 1
UPC # : 0
Item # : 0
Customer wearing glasses : No
Shoe type : TENNIES
Condition of shelf : NO SHELF

## INCIDENT GENERAL INFORMATION

Date of Incident : 2/17/2001 6:00:00 PM
Date facility notified of incident : 2/17/2001
Incident State : TX
Incident description : CUSTOMER HIT BY BLOOD PRESSURE MACHINE
Merchandise fell from : OTHER
Does incident involve BI, PD, or both ? Bodily Injury
Was medical treatment sought at time of incident or mentioned by the customer/member ? No
Incident Location Information
Did incident happen on premises ? Yes
Address where injury occurred : 2721 BOCA CHICA BLVD., BROWNSVILLE,, TX, 78520-0000
Phone : (512) 544-0394
Witness Information
Was there a customer that witnessed the incident ? No
Name : —
Address : —, —, —, ,
Phone : —
Associate with facts relating to incident
Name : —

Title : —
Associate first on scene
Name : —
Title : —
Associate who took the report
Name : SERRANO, MARCOS
Shift : Second Shift
Work Phone : (956) 341-3390
Associate entering claim into reporting system
Name : SERRANO, MARCOS
Title : SUPPORT MGT
Shift : Second Shift

## CLAIMANT # 1

Name : AZNAR MARTINEZ, BEATRIZ
What language does claimant speak ? Spanish
Associate ? No
Sex : Female
Address : BRAVO 501, C.D VICTORIA, —, 87000
Home Phone # : (834) 312-0323
Work Phone # : —
Birthdate : 6/14/1940
Approximate Age : 63
Driver's License # : —, —
Did customer continue to shop ? Yes
Was Claimant a Minor ? No
Type of Injuries/Complaints : SHOULDER AND ARM PAIN
Was ambulance called ? No
Was MD or hospital involved ? No
Companion Information
Did claimant have a companion ? No
Companion Name : —
Address : —, —, —, —
Phone : —
Attorney Information
Does claimant have an attorney or was an attorney
mentioned ?
Attorney's Name : —
Attorney's Address : —,—,—,—
Medical Provider Information
Medical provider name : —
Address : —, —, —, —
Phone : —
Go to Main Screen

WMP-73B (6/01)

# CUSTOMER STATEMENT

STORE #: __1000__    DATE: __2/17/02__    TIME: __13.10__ a.m./p.m.

NAME: _Beatriz Aguero Nito_

ADDRESS: _BRAVO 501-_

CITY: _Cd. Victoria_    STATE: _MEX =_    ZIP: _87000_

PHONE: _834 31-20323_

SSN: ___-___-___    DOB: _JULIO 14-1940_

## HOW DID THE INCIDENT OCCUR?

_Customer was sitting in the Radio Grill Drinking Coffee. The blood_
_Pressure Machine located on the pharmacy side fell over as a_
_Result of Horseplay. The Machine hit the customer on the shoulder_
_and forearm on her left side. She is complaining of a slight pain_
_and swelling._

**ANY CLAIM BEING REPORTED MUST BE SUBMITTED TO CLAIMS
MANAGEMENT, INC. FOR HANDLING OR PAYMENT. IF YOU HAVE
ANY QUESTIONS PLEASE CALL CMI (800) 527-0566**

_____    _____
CUSTOMER SIGNATURE                DATE

_____    _____
MEMBER OF MANAGEMENT SIGNATURE        DATE



# life clinic

from Spacelabs Medical

15220 N.E. 40th Street
P.O. Box 97013
Redmond, Washington 98073-9713
425-882-3700

April 26, 2001

Mr. Brent Thacker
Director of Pharmacy Affairs
Wal-Mart Stores, Inc.
702 SW 8th Street
Bentonville, AR  72716-0465

Dear Mr. Thacker:

We are pleased to provide this letter to supplement the agreement dated January 1, 1998, by and between Vita-Stat Medical Services, Inc. and Wal-Mart Stores, Inc., attached ("Agreement"), which covers your lease of Vita-Stat Model 90550 Blood Pressure Monitors located in all pharmacy locations for Wal-Mart, Sam's Club and Neighborhood Market stores. By your acceptance of this letter, the term of the Agreement will be extended for two years until December 31, 2002. All other provisions of the Agreement remain in effect for the term of this renewal.

Wal-Mart reserves the right to challenge and demand immediate removal of any advertising that appears on the Vita-Stat equipment that in Wal-Mart's sole determination is offensive or not in keeping with the basic beliefs and principles upon which Wal-Mart was founded. In the event Wal-Mart challenges such advertising and Vita-Stat fails to remove the ad in question within 48 hours of receiving notice from Wal-Mart, such failure shall be deemed a material breach of this Agreement. Wal-Mart may terminate this Agreement upon ten (10) days prior written notice in the event of such material breach of this Agreement. For any other material breach, either party may terminate this Agreement in the event of a material breach hereof by the other party which remains uncured for a period of thirty (30) days after written notice from the non-breaching party.

We are also pleased to honor your request to place Lifeclinic Health Stations in up to 250 locations as a trial of this new product. The lease rate for the Lifeclinic Health Station will be zero ($0) as you requested. Since the Lifeclinic Health Station contains special proprietary software, Wal-Mart agrees not to copy, modify or reverse engineer it and it will remain the property of Lifeclinic.com Corporation. A description of the Lifeclinic Health Station is attached. Of course, we leave the decision where to place Lifeclinic Health Stations to you.

Please acknowledge your acceptance of this addendum to the Agreement by signing where indicated below and returning this letter to me by facsimile.

Sincerely,

Dennis Larsen
Vice President, Business Development

DL:j

**Approved as to legal terms only**
by _____
Wal-Mart Legal Team
Date: 5-3-01

Agreed to and accepted:

_____ (SIGNATURE)    5/3/01 (DATE)

Jim Martin (PRINT NAME)
Sr. VP of Pharmacy

Agreed to and accepted:

_____ (SIGNATURE)    _____ (DATE)

_____ (PRINT NAME)

**WMRT 0001303**

Lifeclinic Kiosk
Blood Pressure, Weight and
Health Tracking Information Center

**90557 SPECIFICATIONS**

| | |
|---|---|
| Test time | typically 1 to 3 minutes |
| Accuracy | complies with Association for Advancement of Medical Instrumentation (AAMI) Standard SP10-1992 |
| CRT display with touch screen | 14" graphical color display for easy interaction and operation |
| **Blood pressure measurement** | |
| Range | systolic: +50 to +260 mmHg<br>diastolic: +30 to +240 mmHg |
| Method | oscillometric |
| Overpressure limit | 310 +/-10 mmHg |
| **Connectivity** | |
| Network | RJ45 Ethernet |
| Phone line | analog |
| Input power | 110-120V, 57-60 Hz, @ 4 AMP<br>220-240V, 50-54 Hz, @ 1 AMP |
| **Printer** | |
| Resolution | 200 DPI (9 dots/mm) |
| Width (paper) | 4.38 inches (112 mm) |
| Length (paper) | 100 meters or 25 meters |
| Service | easy front-loading paper cabinet |
| Physical dimensions | 25"D × 41" (W) × 70.5" (H)<br>63.5 cm (D) × 104.1 cm (W) × 179.1 cm (H) |
| System weight | approximately 260 lbs |
| **Weight measurement** | |
| Range | 40-300 lbs |
| Accuracy | +/-1 lb |
| Temperature–operating | 50°F to 104°F (10°C to 40°C) |
| Temperature–storage | –40°F to 131°F (–40°C to 55°C) |
| Humidity–operating | 10% to 95% (noncondensing) |
| Humidity–storage | 10% to 95% (noncondensing) |
| Regulatory and safety standards | ETL, CSA, IEC 601 |



# lifeclinic
from Spacelabs Medical

P.O. Box 97013
16220 N.E. 40th Street
Redmond, WA 98073-9713
Telephone: 425-882-3700
Toll-free: 1-800-251-9910
Fax: 425-885-4877
www.lifeclinic.com

©Lifeclinic. 2000. lifeclinic.com is a trademark of Spacelabs Medical, Inc. (000/0390)

WMRT 0001304

 

## AGREEMENT

This Agreement (the "Agreement") is made and entered into effective as of the 1ST day of January, 1998 by and between Vita-Stat Medical Services, Inc. ("Vita-Stat"), a Florida corporation, and Wal-Mart Stores, Inc., a Delaware corporation ("Wal-Mart").

WHEREAS, Wal-Mart desires to continue to lease certain equipment which measures a user's blood pressure and pulse and which is further described on Exhibit A Hereto (the "Equipment") in certain U.S. Wal-Mart described below; and

WHEREAS, Vita-Stat desires to sell display space on the Equipment to Wal-Mart vendors;

NOW THEREFORE, in consideration of the above premises and the promises and agreements contained herein, the parties agree as follows:

1.    Wal-Mart agrees to lease from Vita-Stat all such Equipment as is located in Wal-Mart stores as of the date of execution of this Agreement. Attached hereto as Exhibit B is a list of all such stores (the "Stores"). Wal-Mart may add stores to Exhibit B with Vita-Stat's written consent. All stores to be added must be located in the continental U. S. and must have a pharmacy, unless otherwise agreed to in writing by Vita-Stat. The typical layouts of Stores in which Equipment is or shall be installed are Attached as Exhibit C hereto. Based on the physical layout of each Store, Wal-Mart represents and agrees that Equipment is or shall be installed at the location indicated on the applicable layout. Wal-Mart agrees, during the Term of this Agreement, to lease space on the Equipment to permit Vita-Stat to attach an advertising display unit (the "Advertising Display") for the purpose of displaying third party advertisements. The lease rates for the Vita-Stat Equipment and for the Advertising Display are shown as Exhibit D. and incorporated herein by this reference.

2.    Delivery of Equipment shall be at Vita-Stat's sole risk and expense. Risk of loss or damage to the Equipment which is in Wal-Mart's possession shall be borne solely by Vita-Stat. Vita-Stat shall obtain any insurance it deems necessary against risk of loss or damage to the Equipment.

3.    a. Wal-Mart shall, at its sole expense, install the Equipment at the Stores. Wal-Mart shall provide a safe and secure location in the Stores for the placement of the Equipment and shall provide power to the Equipment at all times with the electrical power which conforms to the manufacturer's specification. In addition, Wal-Mart shall, at no additional expense to Vita-Stat:

    (i)   provide routine support to keep the equipment clean;

    (ii)  change light bulbs and starters as needed;

    (iii) report service problems with respect to the Equipment or Advertising Display;

WMRT 0001305



(iv) change the ads and place the "take-ones" by the last day of the month (no earlier than the 28th day of the month) in accordance with the monthly instructions delivered by Vita-Stat;

(v) use its best efforts to ensure that ad placement accuracy levels meet or exceed 93% at such time as Vita-Stat makes the phone audit call described herein;

(vi) respond to monthly phone call from Vita-Stat's auditor (such phone call occurs generally during the first week of the month), providing the auditor with requested information pertaining to current ads displayed and the meter readings for the Equipment;

(vii) maintain ad inventory in accordance with instructions received each month in the ad package sent to the Store by Vita-Stat; and

(viii) ensure that the Equipment is positioned at all times so that customers can see the Equipment and the ads clearly displayed.

b. Except as provided above, Wal-Mart shall make no replacements, modifications, alterations or additions to the Equipment without Vita-Stat's prior written consent. All modifications, repairs, alterations, replacements, substitutions, operating accessories and controls shall accrue to the Equipment and become Vita Stat's property.

c. Wal-Mart shall not affix any Equipment to realty so as to change its nature to that of a fixture or real property, and the parties agree that the Equipment shall remain personal property at all times regardless of how attached or installed.

4.    a. Except as otherwise provided in Section 3 above, Vita-Stat shall, at its sole expense keep the Equipment in good working condition during the Term hereof. Wal-Mart shall allow Vita-Stat personnel reasonable access as needed during normal business hours to service, maintain or repair the Equipment, shall promptly notify Vita-Stat of customer complaints or other evidence of malfunction of the Equipment, and shall place an "Out of Order" sign on such Equipment until repaired. Vita-Stat shall achieve an average repair/completion time of 72 hours after receipt of such notice. If Vita-Stat fails to repair or replace any Equipment within ten (10) days after its receipt of notice of malfunction thereof, Vita-Stat shall, upon request of Wal-Mart promptly remove such Equipment from the store. Wal-Mart shall instruct all Store personnel not to disconnect the Equipment except in case of emergency and not in any case to relocated, modify, attempt to repair or tamper with the Equipment. If Vita-Stat determines the Store personnel have acted contrary to such instructions, Vita-Stat shall so notify Wal-Mart, and Wal-Mart shall take appropriate corrective action.

b. In the event of an incident at any of Wal-Mart's Stores involving injuries allegedly caused by any Vita-Stat blood pressure machine, Wal-Mart shall notify Vita-Stat within forty-eight (48) hours of such incident. Vita-Stat shall satisfactorily and promptly resolve any such complaints and advise Wal-Mart of the disposition of same in writing.

WMRT 0001306



c. Vita-Stat will service Equipment located in the counties indicated on Exhibit "E" on a mail-in basis. Vita-Stat may add counties to or subtract counties from Exhibit "E" in Vita-Stat's sole but reasonable discretion; however, Vita-Stat does not presently contemplate any such changes.

5. a. Vita-Stat shall be permitted at its sole expense, to make sales to third party advertisers for the display of third party advertising on the Advertising Display. All advertisements to be placed on the Advertising Display shall conform to prevailing community standards of good taste and shall be for products and/or services sold by Wal-Mart. Vita-Stat and Wal-Mart shall review and agree upon proposed products and/or services sold by Wal-Mart. Vita-Stat and Wal-Mart shall review and agree upon proposed advertisers and products to be displayed on the Advertising Displays and on the content of the advertising. Agreement of products and advertisers to be displayed on the Advertising Displays shall extend for a period of fifteen (15) months from such approval date unless an advertised product's sales is discontinued by Wal-Mart. In the event Vita-Stat and Wal-Mart are unable to agree upon acceptability of products and/or advertisers to be displayed on Advertising Displays, Wal-Mart shall have the right to require Vita-Stat not display such advertising on the Advertising Displays.

b. Wal-Mart shall provide Reasonable Support to Vita-Stat to identify and develop prospective advertising clients. "Reasonable Support" shall include, but not be limited to: (1) the referral of leads and prospects expressing an interest in participating in the Health Monitor Center advertising program; (2) the support of Vita-Stat's marketing, public relations and publicity efforts including positive response to inquiries regarding Wal-Mart's participation and involvement, and endorsement of the Health Monitor Center program to encourage consideration by potential advertisers; (3) the identification of Wal-Mart vendors and suppliers as prospective participants in the Health Monitor Center program; and (4) the promotion of the Health Monitor Center program to Wal-Mart customers to develop awareness and motivate usage of the Health Monitor Centers, in accordance with Section 7 below.

c. Vita-Stat shall defend, indemnify and hold harmless Wal-Mart and its affiliates and employees from any claims arising out of such advertising efforts or any resulting sales or any such third party agreements.

6. Revenues received by Vita-Stat for sales of third party advertising on the Advertising Displays located at the Stores shall be the sole property of Vita-Stat.

7. No use may be made of the Wal-Mart name by Vita-Stat or any third party advertiser in brochures, advertising, correspondence or in any way without Wal-Mart's prior written consent. Each Store pharmacy department shall promote the availability of the Equipment and its services with the Stores though hand-out materials and public address announcements on the Store public address at times reasonably determined by Wal-Mart, but shall use the name of Vita-Stat only in accordance with Vita-Stat's prior written consent. Vita-Stat shall prepare, and shall be responsible for, the content of such written materials and

WMRT 0001307



announcements provided hereunder. Wal-Mart agrees that each written promotion of the Equipment shall include the Vita-Stat name and logo. Each public address announcement shall use the Vita-Stat name in connection with any promotion of the Equipment or related services. Wal-Mart agrees to permit Vita-Stat to conduct training seminars for Wal-Mart Store personnel to acquaint them with the capabilities and use of the Equipment, at times reasonably scheduled by Wal-Mart. Vita-Stat agrees to complete such training at each Store within three (3) months of Equipment installation at such Store.

8.   Wal-Mart shall work with Vita-Stat to produce a Wal-Mart originated press release. The press release shall detail the number of Wal-Mart's Stores to be serviced by Vita-Stat, growth of current business between Wal-Mart and Vita-Stat, and Wal-Mart quotes as to why Vita-Stat was chosen as Wal-Mart's primary blood pressure vendor. Vita-Stat shall have the right to final copy approval and to distribute the release as Vita-Stat sees fit.

9.   Vita-Stat agrees to defend, indemnify and hold Wal-Mart and its affiliates and their employees harmless from and against all claims arising out of Vita-Stat's performance of this Agreement, including without limitation, any and all customer claims with respect to the Equipment or use or results thereof; claims of infringement of patents, copyrights, trademarks, rights of privacy and trade secrets; claims of unfair competition, bodily injury and property or other damage arising in connection with the Equipment; claims that the Equipment or the services rendered by the Equipment do not comply with all applicable federal, state or local laws , rules and regulations; claims of Vita-Stat employees or agents; or claims arising out of the representation or agreements of Vita-Stat with third parties (collectively, "Claims"); provided, however, that Vita-Stat shall be given timely notice of any such claims with respect to which Wal-Mart seeks indemnification, and Vita-Stat shall have the right to control the defense, compromise or settlement thereof and further provided that Wal-Mart shall reasonably cooperate in the investigation and defense of any claim, including but not limited to the provision of all documents and information related to the alleged incident. In connection with such defense, Vita-Stat shall use good faith efforts to protect confidential and proprietary documents and information of Wal-Mart and shall not release, except as required by law, such information or documents to any third party other than legal counsel, accountants and insurance representatives, without the express prior written consent of Wal-Mart. The foregoing indemnification shall not apply to claims arising out of Wal-Mart's willful misconduct or negligence. Vita-Stat shall obtain and maintain commercial general liability insurance, with annual aggregate policy limits of at least $2,000,000, to cover public liability of Wal-Mart with respect to Claims (other than to the extent of Wal-Mart's willful misconduct or negligence) as an additional insured and shall provide a copy of the applicable certificate of insurance within ten (10) days for the execution hereof.

10.  Neither party shall be liable to the other hereunder for consequential, special, punitive or exemplary damages.

11.  a.  The term of the Agreement shall commence on January 1, 1998 (the Commencement Date") and continue for a period of 36 months thereafter (the "Term").

WMRT 0001308

 

b.  Vita-Stat shall have the right to terminate lease of the Advertising Display upon 90 days' prior written notice, at any time that it determines in the good faith exercise of its business judgement that the advertising revenues likely to be received relative to the Equipment over the term of the Agreement, are not likely to exceed Vita-Stat's aggregate costs of performance under this Agreement.

c.  Each party reserves the right to immediately terminate this Agreement on written notice to the other party if the other party admits in writing that it is insolvent, or becomes involved in any bankruptcy or similar proceeding not vacated with sixty (60) days after its commencement or remains in material breach of any provision hereof for a period of sixty (60) days after receipt of written notice from the other party specifying the nature of the material breach.

d.  Notwithstanding the Term set forth in Section 11(a) above, Wal-Mart shall have the right to terminate this Agreement effective as of December 31, 2000, upon 90 days prior written notice to Vita-Stat.  In the event Wal-Mart exercises such right of early termination Vita-Stat shall have until June 30, 2001, to remove equipment existing in stores as of the termination date.  During the six-month removal period Wal-Mart may contract with similar service/equipment companies for equipment to be placed in any Wal-Mart stores including those with Vita-Stat equipment.

e.  Upon expiration or termination of this Agreement, or upon the deletion of any Store as permitted hereunder, Vita-Stat shall promptly remove the Equipment from the applicable Store(s) at its sole expense and risk.  During the term of this Agreement, Wal-Mart agrees not to install, utilize or permit the use of any other public testing or self-test blood pressure measurement equipment, or any equivalent device, at any Wal-Mart Store with installed Vita-Stat Equipment.

12.   All costs, charges and expenses incurred in connection with Vita-Stat's performance of this Agreement shall be borne by Vita-Stat.

13.   Any provisions of Vita-Stat's proposals, contracts, invoices, billing statements, acknowledgement forms or any other documents which are inconsistent with the provisions of this Agreement shall be of no force or effect.

14.   Vita-Stat is and at all times shall be an independent contractor in performance of this Agreement.  Neither party is authorized to bind the other in any dealing with third parties.  No partnership or joint venture is hereby created between the parties.  Wal-Mart does not hereby acquire any interest in the Equipment or the Advertising Display and agrees not to remove any identification labels affixed to the Equipment or to the Advertising Display, or allow them to be subjected to any liens or encumbrances arising through Wal-Mart or its business operations.  Vita-Stat shall exercise control over its employees and shall be solely responsible for the payment of any wages, salaries or other remuneration if its employees and for the payment of any payroll taxes, contributions for unemployment insurance, social security, pensions or annuities which are imposed as a result of the employment of its employees.

15.   Neither party shall be considered in default in the performance of its obligations hereunder to the extent that the performance of any such obligation is prevented or delayed

- 5 -

**WMRT 0001309**

 

by labor disturbances, civil disorders, war, acts of God, transportation delays, supply shortages, rules and regulations of any federal, state or other governmental agency, or by any unforeseen business occurrences or the other similar delays beyond control of such party. Periods of force majeure shall be deemed to begin at the time the party subject to the force majeure stops performance or operations hereunder by reason of force majeure, and such party shall notify the unaffected party of the beginning and ending date of each such period. The time required for performance by either party as stated herein shall be extended for such period of time as force majeure delays, hinders or prevents such performance.

16.    No modification, alteration or amendment of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties.

17.    Either party may assign or otherwise transfer its rights, obligations or duties under this Agreement with the prior written approval of the party, which shall not be unreasonably withheld.

18.    This Agreement sets for the entire agreement between the parties with respect to the subject matter hereof. This Agreement shall supersede all prior understandings, agreements, contracts or arrangements between the parties, whether oral or written.

19.    If any provision of the Agreement is held to be illegal, invalid or unenforceable under present or future laws: (a) such provision shall be fully severable; (b) the Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision and never comprised a part hereof; and (c) the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as of part hereof a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

20.    Whenever the singular is used herein, the same shall include the plural where appropriate, and vice versa; and words of any gender in this Agreement shall include each either gender where appropriate.

21.    Wal-Mart agrees to cooperate with Vita-Stat to the extent Vita-Stat may reasonably deem necessary in order to enable Vita-Stat at its sole expense, to give proper notice under the local laws that the Equipment and Advertising Displays located in the Stores are the sole property of Vita-Stat and that Wal-Mart has no interest therein.

22.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same Agreement.

23.    The parties agree that during the Term if this Agreement, there shall be no disclosure to any third party relating to the nature or terms and conditions of this Agreement unless otherwise agreed to by the parties.

- 6 -

**WMRT 0001310**

24.  This Agreement shall be construed and enforced in accordance with the laws of the State of Arkansas.

WAL-MART STORES, INC.

By: _____
Brent Thacker
Director of Pharmacy Affairs

Date: 5/3/99

By: _____
Jim Martin
Vice President of Pharmacy Div.

Date: 6/23/99

VITA-STAT MEDICAL SERVICES

By: _____
Rich Doherty
General Manager

Date: 3/18/99

By: _____

Date: _____

Approved as to legal terms only
by _____
Wal-Mart Legal Team
Date: 6-22-99

WMRT 0001311

 

## EXHIBIT A

### Vita-Stat HMC Program
### Wal-Mart Equipment Description

Each Wal-Mart installation will consist of the following:

- **Vita-Stat Model 90550 Blood Pressure Monitor:** Includes fully automated cuff assembly, electronics module which displays systolic and diastolic blood pressure, and pulse rate.

- **Customized Display:** A lighted display provides four spots for instore advertisements and distribution of "take-one" information leaflets. The sign is customized with the Wal-Mart logo.

WMRT 0001312



## EXHIBIT D

### Lease Price Schedule

Wal-Mart lease of HMC units
(Model 90550-02) from Vita-Stat:

|  |  |
|---|---|
| Lease price | $50/month/unit |
| Credit for operations support | $20/month/unit |
| Adjusted lease price | $30/month/unit |

Vita-Stat lease of ad display space from
Wal-Mart:                                              $30/month/store

Total net lease payments due from Wal-Mart
to Vita-Stat:                                          $0/month/unit

Total net lease payments due from Vita-Stat
to Wal-Mart:                                          $0/month/store

Cosmetic Damage Payment

Wal-Mart agrees to pay Vita-Stat for any cosmetic damages to the cabinetry of the blood pressure units, up to the amounts provided below. Such damage payments ("Damage Payment") shall be for the actual amount of any such damages but shall in no event exceed on an annual basis the following total dollar amounts:

Maximum Damage Payments:

For Months 1 - 12:          $60 x Number of Units leased as of the Effective Date

For Months 13 - 24:         $60 x Number of Units leased as of the first anniversary of the
                            Effective Date

For Months 25 - 36:         $60 x Number of Units leased as of the second anniversary of
                            the Effective Date

For Months 37 - 42:         1/2 x $60 x Number of Units leased as of the third anniversary
                            of the Effective Date

The Damage Payment amount must be determined by mutual agreement of the parties in advance of invoicing. Vita-Stat shall invoice Wal-Mart for the Damage Payment every six (6) months during the Term. The invoice shall be due and payable within thirty (30) days of receipt. The parties agree and understand that the annual Damage Payment with respect to any one blood pressure unit may exceed $60.

WMRT 0001313

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

## MEDMARC Casualty Insurance Company
### 14280 Park Meadow Drive, Suite 300

### Chantilly, VA  20151-2219

Policy Number:  **01WA010002**                                Renewal of Number:  **00WA010001**

| Named Insured & Address | Producer's Name & Address |
|---|---|
| Spacelabs Medical, Inc. | Willis |
| See SCHEDULE OF NAMED INSURED | 505 Union Station |
| 15220 NE 40th Street | 505 Fifth Avenue South |
| P.O. Box 97013 | Suite 200 |
| Redmond, WA  98073-9713 | Seattle, WA  98104 |

Policy Period: From  8/31/2001  to  7/1/2002  at 12:01 A.M. Standard Time at your address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

LIMITS OF INSURANCE:

| | | |
|---|---|---|
| GENERAL AGGREGATE LIMIT (Other than Products/Completed Operations) | $ | 2,000,000 |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ | 2,000,000 |
| PERSONAL & ADVERTISING INJURY LIMIT | $ | 1,000,000 |
| EACH OCCURRENCE LIMIT | $ | 1,000,000 |
| FIRE DAMAGE LIMIT | $ | 500,000 Any One Fire |
| MEDICAL EXPENSE LIMIT | $ | 10,000 Any One Person |

Form of Business:  ☐ Individual    ☐ Partnership    ☒ Corporation
☐ Joint Venture    ☐ Organization (Other than Partnership or Joint Venture)

Business Description:  **Medical Device Manufacturer**

Location of all premises you Own, Rent or Occupy:

**All Locations of the Named Insured**

| CLASSIFICATION | CODE NO. | PREMIUM BASIS | RATE | ADVANCE PREMIUM | |
|---|---|---|---|---|---|
| | | | | PRODUCTS | ALL OTHER |
| | | | | | |

ITEM 1.  SELF-INSURED RETENTION AMOUNTS:        $  100,000  per occurrence

$  300,000  aggregate

ITEM 2.  ENDORSEMENTS ATTACHED TO THIS POLICY:    See schedule attached

COUNTERSIGNED  _____    BY  _____

Authorized Representative

313 (NV) 07 01        Date Issued:    11/6/2002

**EXHIBIT B**